[Tagged]



**ORDERED in the Southern District of Florida on August 13, 2012.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                                            Case No. 10-25535-EPK

JOHN E. BENEVENTO,                                Chapter 7

        Debtor.
_____/

THE CADLE COMPANY OF
CONNECTICUT, INC.,

        Plaintiff,

v.                                                Adv. Proc. No. 11-01011-EPK

JOHN E. BENEVENTO,

        Defendant.
_____/

## <u>MEMORANDUM OPINION</u>

THIS MATTER came before the Court for trial on November 14, 2011, February 28,

2012, March 23, 2012, and April 3, 2012 upon the Complaint [ECF No. 1] filed by The Cadle

Company of Connecticut, Inc. (the "Plaintiff") against John E. Benevento (the "Debtor").
This Memorandum Opinion presents the Court's findings of fact and conclusions of law in
the above-captioned adversary proceeding pursuant to Fed. R. Bankr. P. 7052.

The Plaintiff challenges the entry of the Debtor's chapter 7 discharge under several
provisions of section[1] 727.  The Complaint presents four counts: Count I for denial of
discharge under section 727(a)(2)(A); Count II for denial of discharge under section
727(a)(3); Count III for denial of discharge under section 727(a)(4)(D); and Count IV for
denial of discharge under section 727(a)(5).  The Plaintiff has the burden of proof on all
matters by a preponderance of the evidence. *Jennings v. Maxfield (In re Jennings)*, 533 F.3d
1333, 1339 (11th Cir. 2008) (quoting *Grogan v. Garner*, 498 U.S. 279 (1991)).

The Plaintiff alleges that the Debtor structured his business and personal financial
affairs over a period of decades (even before the Plaintiff had a claim against the Debtor)
with the intent of preventing the Plaintiff from collecting on its judgment.  The Plaintiff
undertook a fishing expedition, looking for evidence to support its suspicions.  The Plaintiff
sought and received two continuances of the pretrial hearing in this case, thereby obtaining
five additional months for discovery.  The Plaintiff then sought and received an extension of
certain deadlines in the Court's scheduling order in order to review the voluminous
discovery.  The Plaintiff defended the Debtor's motion for protective order early in the
discovery phase of this case (wherein the Debtor argued the Plaintiff's discovery was overly
broad), and prosecuted several discovery motions of its own.  The Plaintiff's case in chief
and rebuttal took up most of the four days of trial.  The Plaintiff pursued all of this in the
cause of obtaining and presenting documentation of the Debtor's financial affairs and his
transactions with family members and others over a period going back more than two

---

[1] The terms "section" and "sections" refer to sections of the United States Bankruptcy Code, 11 U.S.C.

decades.  In response, the Debtor, his spouse, several of his family members, and others produced literally a mountain of documents, many of which were admitted at trial.  These documents indicate primarily that the Debtor and his family members maintained surprisingly detailed records over a period of several decades.  Contrary to the Plaintiff's suspicions, the fruits of its seemingly boundless discovery do not support the Plaintiff's claims.  The Debtor and his wife testified at length during trial.  Their thoroughly credible testimony, contradicting all of the Plaintiff's material allegations, was supported by the record in this case.  The Court considered the testimony of witnesses and the documentary evidence admitted at trial, and the post-trial memoranda filed by the parties in the form of proposed findings of fact and conclusions of law.  The Plaintiff failed to meet its burden in proving any of its claims under section 727.  For the reasons stated more fully below the Court will enter judgment in favor of the Defendant on all counts.

## I.    FINDINGS OF FACT

### The Debtor

The Debtor is a retired former teacher, university administrator, and real estate investor homesteaded in Florida.  Between the time of his retirement from the University of New Haven in 1986 and the settlement of litigation with a business partner in 2004, he invested in various businesses including auto sales, plumbing, and limousines.  As a result of his business ventures, the Debtor became personally liable on a number of debts.  With the exception of the claim held by the Plaintiff, all these debts were paid or settled with the assistance of the Debtor's attorney, Lawrence Greenberg.  The Debtor retired from business activity in 2004.  Since that time he has not maintained a checking account.

§§ 101 *et seq.*

The Debtor has been married for more than 40 years to Joan Benevento ("Joan"). Joan was employed as a teacher for many years. She owned real estate of her own prior to her marriage to the Debtor. Joan continues to own real property and other assets independent of the Debtor and has the benefit of a pension. She handles all of the family finances; this arrangement predates the Plaintiff's attempts to collect from the Debtor.

**The Plaintiff's Claim**

In 1991, the Debtor guaranteed a mortgage loan on behalf of one of his business entities. The property subject to the mortgage was sold to pay taxes, wiping out the mortgage and triggering the Debtor's liability under the guaranty. The Plaintiff purchased the loan from the original lender and, in 1995, brought suit in Connecticut against the Debtor. In November 1995 the Connecticut state court entered a default judgment against the Debtor in the amount of $313,910.96 in damages plus costs taxed at $859.94.[2]

One would assume that the Debtor received notice of the Plaintiff's suit in Connecticut prior to entry of default judgment. Nonetheless, the Debtor states that he did not know of the Plaintiff's judgment until the Plaintiff undertook collection efforts nine years later, in 2004, by garnishing a joint checking account held by the Debtor and his son. There is nothing in the evidence admitted in this case showing that the Debtor had any reason to believe he would be subject to collection activity by the Plaintiff prior to that time. The Debtor then referred the Plaintiff to his attorney who attempted to settle the matter; settlement talks proved unsuccessful.

In 2010, as a result of a real estate transfer described below, the Plaintiff sued the Debtor in Massachusetts state court (*The Cadle Company of Connecticut, Inc. vs. John E.*

---

[2] The record reflects only scant evidence of the background for the Plaintiff's claim against the Debtor. The facts presented in this paragraph are cobbled together from various references in the record and do not appear to be in dispute.

4

*Benevento and Joan K. Benevento*, Commonwealth of Massachusetts Civil Docket No. BECV2010-00095). The Debtor attempted to settle with the Plaintiff a second time. When the parties failed to settle the Debtor filed the above-captioned chapter 7 case. The Plaintiff presented two proofs of claim in the Debtor's chapter 7 case, in the amounts of $1,173,852.15 and $768,746.84.

### Debtor's Alleged Interest in Benevento Family Holdings

The Plaintiff alleges that the Debtor, through various businesses and transactions involving his family members, acquired a number of assets from which he receives substantial income and which he has concealed. The Debtor claims that, except for his Florida homestead, pension account, and social security income (all of which are exempt), the properties and entities pointed to by the Plaintiff are owned and controlled by members of the Debtor's family and he receives only insignificant benefits from them. Relying on voluminous documents admitted at trial, the Plaintiff attempts to indict the Debtor under a cloud of suspicion. However, in spite of the literal weight of the exhibits propounded by the Plaintiff, the Plaintiff's allegations are not supported by the evidence. Indeed, the evidence taken as a whole, in light of the credible testimony of the Debtor and Joan, supports the Debtor's contentions. The Court will review in turn each of the allegedly concealed property interests of the Debtor.

### Genesis of the Debtor's Family Trusts

In 1986, following a calamitous hotel fire in which the Debtor and his children were injured (discussed more fully below), the Debtor retired from the University of New Haven and pursued a number of business investments. Soon thereafter, the Debtor and his wife dedicated a portion of their assets to trusts and business entities created for the benefit of their two children, Chandra Benevento ("Chandra") and John B. Benevento ("Brandon").

### Carol Munch Trust and 42 South Gate Island Road

The so-called "Carol Munch Trust" was formed by the Debtor and his wife in 1990 and was recorded in 1991, four years prior to entry of the Plaintiff's judgment and thirteen years prior to the Plaintiff's initial collection efforts. The trustee, Carol Munch, is Joan's sister and thus the Debtor's sister-in-law. The only beneficiaries of the Carol Munch Trust are the Debtor's children, Chandra and Brandon. The grantors did not retain a right to revoke the trust. Trust assets revert to the grantors only if both beneficiaries die before Chandra reaches the age of 25. Chandra reached the age of 25 prior to the filing of the Debtor's chapter 7 petition, and so the Debtor's estate did not obtain any interest in the Carol Munch Trust.

At present, the sole asset in the Carol Munch Trust is a vacation home and real property located at 42 South Gate Island Road ("42 South Gate")[3] in Otis, Massachusetts. The Debtor and Joan purchased 42 South Gate in 1983 and transferred it into the Carol Munch Trust in 1990. This was the year before the Debtor executed the guaranty that eventually gave rise to the Plaintiff's claim. The Carol Munch Trust held two other parcels of real property for short periods of time in the 1990s. The trust did not profit from these transactions. At one time the trust held a mortgage loan payable by the Debtor. As of the petition date in the Debtor's chapter 7 case, the trust no longer held these assets.

According to its terms, the Carol Munch Trust was to terminate upon the twenty-fifth birthday of the Debtor's younger child, Chandra, with the trust assets then to be

---

[3] The evidence includes reference to two separate properties on South Gate Island Road in Otis, Massachusetts. Number 42, addressed here, is a vacation home placed in the Carol Munch Trust. Number 46 is another vacation home at first held in a state court approved guardianship for Chandra and Brandon, later held directly by Chandra and Brandon, and the subject of various transfers addressed more fully below. At trial, the Plaintiff often confused these two properties. However, the documentary evidence is consistent in their treatment and the Court's findings are based on the documentary evidence and the un-rebutted testimony of the Debtor and Joan.

distributed equally to Chandra and Brandon. Although Chandra is now more than thirty years old, the assets in the Carol Munch Trust have yet to be distributed.

The Plaintiff suggests the failure of the trustee to distribute trust assets upon termination of the Carol Munch Trust somehow implies that the Debtor has an interest in the trust or the trust property, and that the Debtor has concealed this interest. It is not clear how the Plaintiff reaches this conclusion. The Carol Munch Trust was established long ago. 42 South Gate was transferred into the trust prior to the Debtor becoming conditionally liable on what would later be the Plaintiff's claim. The Debtor retained no legal or equitable interest in the trust or in property held in the trust. The beneficiaries, Chandra and Brandon, have an equitable interest in the former trust assets which remain in the name of the former trustee, who retains legal title for their benefit alone. Nothing in evidence suggests that the Debtor has any interest in the Carol Munch Trust or 42 South Gate.

### The Benevento Family Trust

The so-called "Benevento Family Trust" was never a legal entity. The Debtor and Joan included this name on a checking account used by them to make charitable contributions. The name Benevento Family Trust was sometimes used in legal documents in place of one or another of the family's legal trusts, without any material import here. The evidence does not disclose any assets now or previously held in the name of the Benevento Family Trust that may be the subject of an action under section 727.

### The Age 21 Trusts and the Broadway Shopping Plaza

In 1991, before the loan default giving rise to the Plaintiff's claim against the Debtor, and several years before the Plaintiff filed suit against the Debtor, the Debtor and Joan established a trust for each of Brandon and Chandra. The trusts were designated the "Chandra Benevento Age 21 Trust" and the "John B. Benevento Age 21 Trust" (together,

7

the "Age 21 Trusts"). The Age 21 Trusts were explicitly irrevocable. By their terms, each Age 21 Trust terminated upon the beneficiary reaching the age of twenty-one. Joseph Benevento, the Debtor's brother, acted as trustee for both trusts.

The Chandra Benevento Age 21 Trust held real property comprising a small shopping plaza located at 28-34 Broadway[4] in North Haven, Connecticut (the "Broadway Shopping Plaza"). The trust purchased the Broadway Shopping Plaza in 1993 from GT Corporation[5], two years before the Plaintiff filed suit against the Debtor. Although title to the Broadway Shopping Plaza was held in the name of the Chandra Benevento Age 21 Trust, the property was owned for the benefit of both Age 21 Trusts. The income from the Broadway Shopping Plaza was distributed equally to the Chandra Benevento Age 21 Trust and the John B. Benevento Age 21 Trust. The Debtor has never received any income or distributions from the Broadway Shopping Plaza or either of the Age 21 Trusts.

When Brandon and Chandra reached the age of 21 the Chandra Benevento Age 21 Trust and the John B. Benevento Age 21 Trust terminated. The trust assets were transferred to a new entity, the Benco Group, LLC ("Benco"), owned by Chandra and Brandon.[6] Thereafter, income from the Broadway Shopping Plaza was deposited in Benco accounts. However, title to the Broadway Shopping Plaza was not transferred to Benco. Instead, legal title was transferred to the former trustee, Joseph Benevento. The evidence does not disclose why title to the property was not transferred directly to Benco. Joseph Benevento never received income from the Broadway Shopping Plaza.

When the Broadway Shopping Plaza was sold in 2009 the proceeds and a purchase

---

[4] The evidence shows the address as both "28-30 Broadway" and "28-34 Broadway." There is no material dispute as to the general location or nature of the property.

[5] GT Corporation was a business entity owned in part by the Debtor. GT Corporation had acquired the Broadway Shopping Plaza in 1984.

[6] Benco is addressed more fully below.

money mortgage were delivered to Benco via Joseph Benevento and Joan.  The evidence does not disclose why the proceeds of the sale and the purchase money mortgage were not delivered directly to Benco.  At closing, the Age 21 Trusts required $200,000 to pay off an existing mortgage.  Unable to borrow money themselves, Chandra and Brandon looked to their parents to assist in obtaining a loan.  The Age 21 Trusts obtained the necessary funds via a loan arranged by the Debtor secured by a mortgage on real property at 46 South Gate Island Road ("46 South Gate") in Otis, Massachusetts, a property held for the benefit of Chandra and Brandon.  While the Debtor facilitated the loan, including by taking title to 46 South Gate for a short period of time, the Debtor did not obtain any equitable interest in 46 South Gate or the Broadway Shopping Plaza.  The loan transaction involving 46 South Gate is addressed in more detail below.

The Plaintiff suggests that the fact that title to the Broadway Shopping Plaza was not held by Benco, that the proceeds from the sale of the Broadway Shopping Plaza were not paid directly to Benco, and that the Debtor assisted his children in obtaining a loan to clear title on the Broadway Shopping Plaza to facilitate its sale, should lead the Court to question whether the Debtor somehow had an interest in the Broadway Shopping Plaza. Yet the Debtor had not had even an indirect interest in the Broadway Shopping Plaza since prior to the Plaintiff pursuing legal action against the Debtor, title to the property was at all times lodged in an entity or person acting for the benefit of Chandra and Brandon, and Chandra and Brandon received all benefit from the sale of the property via their corporation, Benco.  While the Debtor obligated himself personally on the loan secured by 46 South Gate, Benco made all the payments on that loan.  There is no evidence to suggest that the Debtor retained or obtained any legal or equitable interest in the Broadway Shopping Plaza.

**46 South Gate Island Road**

In 1986, the Debtor, his family, and a number of friends vacationed at the Dupont Plaza Hotel in San Juan, Puerto Rico. While they were there, a group of disgruntled employees started a fire in a storage room on the hotel's ground floor. The fire spread quickly, killing ninety-seven people, among them several of the Debtor's friends. The Debtor himself was injured escaping the fire. The Debtor's children, then quite young, were trapped in an upper-story bedroom and suffered physical and emotional injuries. The surviving victims of the fire and the decedents of those killed filed a class action lawsuit that was ultimately settled. The Debtor and his children received cash settlements.

With approval of the appropriate Connecticut court, Joan used the proceeds of the hotel fire settlement designated for Chandra and Brandon to create a guardianship for them. As guardian, Joan obtained court approval to use the funds to buy 46 South Gate. In 2008, the guardianship expired and Chandra and Brandon each received a direct 50% interest in the property.

In 2009, shortly after termination of the guardianship containing 46 South Gate and transfer of 46 South Gate directly to Chandra and Brandon, Chandra and Brandon's entity, Benco, was attempting to sell the Broadway Shopping Plaza. In order to clear title for the sale, Benco required $200,000 to pay off an existing mortgage. As the owners of Benco, Chandra and Brandon attempted to obtain a mortgage on the 46 South Gate Island property, which they then owned outright. Their mortgage application was rejected. Joan attempted to obtain a loan for them in her own name and her application was also rejected. In order to take advantage of the Debtor's credit, Chandra and Brandon transferred title to 46 South Gate to the Debtor solely to facilitate the Debtor obtaining a mortgage loan secured by that property. The Debtor obtained a mortgage loan in the amount of $250,000 and immediately thereafter transferred 46 South Gate to Joan. Joan took legal title

because Chandra feared reprisal from the recent acrimonious dissolution of Chandra's long-term romantic relationship.[7]  Contemporaneous documentation confirms that the Debtor did not obtain any equitable interest in 46 South Gate and that Joan held the property for the benefit of Chandra and Brandon.

From the proceeds of the $250,000 loan obtained by the Debtor, $200,000 was used to clear title on the Broadway Shopping Plaza, which was sold for the benefit of its owners, Chandra and Brandon.  The remaining $50,000 was deposited in Joan's bank account and loaned to Joseph Benevento and Benevento Motors.  It is unclear what became of these loans.  The Debtor sold Benevento Motors in 1997, 13 years before filing this case.  There is nothing in the record to show that any loans from the $50,000 distributed by Joan remained outstanding within a year prior to the Debtor filing his petition here.  Indeed, given the passage of more than a decade, and the hundreds of transactions undertaken by Joan during that period, it seems extremely unlikely that any amounts remained unpaid within the year prior to the commencement of the Debtor's bankruptcy.  Thus, even if the $50,000 borrowed by the Debtor was used to make loans to others, with the Debtor retaining an interest in the repayment of the same, there is no evidence showing that such right to repayment, a potential property interest that could be concealed, remained extant within the time period covered by section 727(a)(2).

In late 2009, Joan transferred title in 46 South Gate back to the Debtor in order to refinance the mortgage.  The Debtor held title for four days to facilitate closing on the refinancing and then transferred title back to Joan.  After the Debtor transferred title back

---

[7] The Plaintiff includes these facts in its argument that the Debtor's involvement in the mortgage loan transaction for 46 South Gate shows that the Debtor was attempting to avoid payment to his creditors.  If anything, the facts show only that Chandra, concerned about a person who likely would not be a creditor of her in any case, wanted to keep her assets out of her own name.  There is nothing in these facts that raises a red flag with regard to the Debtor.  Indeed, the Debtor's actions show only

to his wife, the Plaintiff filed a complaint in state court arguing that the Debtor had fraudulently transferred 46 South Gate in order to avoid payment of the Plaintiff's judgment.  The Plaintiff's state court action eventually lead the Debtor to file the present chapter 7 case and this adversary proceeding followed.  In this second transaction involving 46 South Gate, as before, there is no evidence that the Debtor obtained any equitable interest in 46 South Gate.  Although the Debtor reaffirmed the refinanced mortgage loan in his chapter 7 case, apparently to prevent a technical default thereunder, the mortgage loan has been paid by Benco.

**Benco and the Mercedes-Benz**

As mentioned above, Benco was created by Chandra and Brandon following the termination of the Age 21 Trusts, initially to hold the Broadway Shopping Plaza which had previously been lodged in the trusts.  Although most of the year the Debtor lives more than 1,300 miles away in Florida, the Debtor performs intermittent management duties for Benco.  He also occasionally purchases items on its behalf for which he is reimbursed.  Benco provides the Debtor with the use of a 2008 Mercedes-Benz E320 automobile that is kept in Massachusetts.  The Debtor uses this vehicle when he visits Massachusetts in the summer months.  The Debtor stated that the automobile was a gift from Chandra and Brandon via Benco.  The Mercedes-Benz is listed as an asset in the Debtor's schedules filed in his chapter 7 case.  However, Benco claims legal title to the car and makes payments on it; the Mercedes-Benz would not be an asset subject to distribution to creditors in this case.  The Mercedes-Benz was fully disclosed in the Debtor's chapter 7 case.  There is no evidence that the Debtor's use of the vehicle was concealed from anyone.  Other than the use of the car, the Debtor does not receive any financial benefit from Benco and has never received

that he acted as any good parent would in facilitating a transaction for the benefit of his children.

any distributions of rents or other profits from Benco.[8]  There is no credible evidence that the Debtor has ever had an interest in Benco that could be the subject of concealment.

### Carmel Realty, LLC and the Amodio Settlement

In or around 2000, the Debtor acquired a 50% interest in Erector Square, LLC ("Erector"), a real estate investment company.  Casper Amodio ("Mr. Amodio") held the other 50% interest.  The Debtor's relationship with Mr. Amodio soon soured.  Mr. Amodio accused the Debtor of financial improprieties and attempted to terminate the Debtor as an officer of Erector.  The Debtor responded by filing an action in Connecticut state court seeking the appointment of a receiver.  The litigation was settled in 2004.  As a result of the settlement, the assets of Erector were transferred to a new entity, Capp Associates, LLC, in which the Debtor retained an ownership interest.  In addition, the Debtor received a cash settlement of approximately $850,000.

The cash settlement received by the Debtor from Mr. Amodio was spent long ago. The Debtor provided ample evidence of how these funds were expended.  The record includes a copy of Joan's contemporaneous Wachovia Bank checking account check register (the "Wachovia Check Register"), along with copies of two of Joan's checking account statements covering the period December 21, 2004 through March 18, 2005 (the "Wachovia Statements").  The Wachovia Check Register and the Wachovia Statements each show a deposit of $836,934.74 into Joan's checking account.  Joan testified that this $836,934.74

---

[8] The Plaintiff presented evidence, taking up a substantial portion of a day at trial, regarding reimbursements received by the Debtor from Benco.  When visiting his children, the Debtor occasionally purchases items for Benco from retailers, such as Home Depot, presents reimbursement requests to Benco, and is repaid.  In response to the Plaintiff's allegations, the Debtor produced extensive documentation to show that the reimbursements were legitimate and did not result in any income to him except as a result of a small number of accidental double payments not material in amount.  The evidence included copies of the actual sales receipts for which the Debtor sought reimbursement.  In light of this thorough record-keeping by Benco, the Plaintiff dropped an entire count of its Complaint.

constituted the net cash proceeds from the Debtor's settlement with Mr. Amodio.[9]  The

Wachovia Check Register and the Wachovia Statements, combined with Joan's un-rebutted

testimony, show in detail how these funds were disbursed.

In 2005, Capp Associates, LLC was renamed Carmel Realty, LLC ("Carmel"), and

the Debtor transferred his interest in Carmel to Chandra and Brandon as a gift.  There is

no evidence before the Court addressing the value of the Debtor's interest in Carmel at the

time he transferred it to his children.  As with Benco, although the Debtor lives quite far

from Carmel's business operations and visits New England for only a short time each year,

the Debtor performs intermittent management work for Carmel.  The Debtor receives no

income from Carmel.[10]

The Debtor received a substantial sum of money from Mr. Amodio in 2005 and those

funds were immediately loaned or transferred to several other persons and entities.  In that

same year the Debtor transferred his interest in Carmel to his children.  This was the year

following the Plaintiff's first attempt to collect on its judgment against the Debtor.  The

Plaintiff argues that the Debtor somehow retained an interest in the cash received from the

Amodio settlement, perhaps that some of those funds were loaned and the loans, yet to be

repaid in full, represent a property interest held for the benefit of the Debtor.[11]  The

---

[9] It is not clear from the evidence what adjustments may have been made to the purported $850,000 cash settlement prior to distribution of the net proceeds to the Debtor.  However, the Plaintiff did not dispute or provide any evidence to contradict Joan's testimony that the amount deposited in her checking account represented the entire amount of cash paid to the Debtor.
[10] The record reflects that Carmel has made a number of payments to Joan or for Joan's benefit, including payments on the mortgage for the Florida homestead owned by Joan and the Debtor.  The evidence includes detailed accounting records showing that these transfers were in repayment of loans made by Joan, individually, to Carmel.  While the Debtor receives an indirect benefit from some of these transfers, particularly those used to pay the mortgage on his home, it is certainly within Joan's power to cause repayment to be used to pay the mortgage on her home.  Joan's credible testimony on this issue was not rebutted.  There is nothing in the record to support the contention that any such transfers were other than for repayment of valid loans made by Joan to Carmel.
[11] The Plaintiff did not explicitly argue that the Debtor retained an interest in any unpaid loan, but this is the most logical interpretation of the Plaintiff's arguments on the issue.

Plaintiff suggests that the Debtor's occasional involvement in assisting his children in management of Carmel shows that he has retained an interest in Carmel.  The Plaintiff argues that the Debtor had these property interests in the year prior to filing this case and has concealed them.  However, these transactions occurred more than five years prior to the Debtor filing his bankruptcy petition.  The cash proceeds from the Amodio settlement were long gone by the year prior to this case.  There is no evidence that any loan made with such proceeds, if the transfers were indeed loans, was not repaid long ago.  The documentary evidence, which is quite substantial, does not show that the Debtor received anything at all from Carmel since it was transferred to his children.  There is no credible evidence that the Debtor retained any interest in the funds transferred from the cash settlement or in Carmel within the year prior to the commencement of his chapter 7 case.[12]  There was nothing that could have been the subject of concealment.

**8 Ely Street**

Brandon owns real property at 8 Ely Street in Branford, Connecticut.  Brandon purchased the property using a down payment of $80,000 borrowed from Mr. Amodio.  The Debtor facilitated this loan.  The evidence does not indicate whether the Debtor legally obligated himself on this loan.  It appears that the Debtor simply arranged for the loan to

---

[12] At the risk of inserting a legal conclusion in the Court's findings of fact, albeit on an issue not material to the Court's ruling here, the Court notes that the distribution of the cash settlement from Mr. Amodio and the transfer of Carmel to the Debtor's children may have constituted fraudulent transfers under applicable state law.  The Debtor obviously knew of the Plaintiff's judgment at that time because the Plaintiff had the prior year attempted to collect on it.  But this is not a fraudulent transfer action.  The fact that the Debtor may have transferred assets outright, without retaining any interest therein as far as the Court can discern, more than five years prior to filing his petition, even if such transfers could have been considered fraudulent transfers under state law, does not show that the Debtor concealed property within the meaning of section 727.  As discussed more fully below in the Court's conclusions of law, a concealment action requires that the debtor have an interest in something in the one year period prior to the bankruptcy petition.  There must be some property right to be concealed.  Here, the evidence leads the Court to conclude that while the Debtor had an interest in cash and a corporate entity long before his bankruptcy, he transferred them more than five years prior to filing here and did not retain anything.

15

be made by Mr. Amodio directly to Brandon.  The Debtor obtained no personal financial

benefit from the loan, which was provided to Brandon to purchase the Ely Street property.

Even if the Debtor somehow obligated himself on this loan, there is no credible evidence to

support the Plaintiff's argument that the Debtor thereby obtained any interest in the Ely

Street property.  Because the Debtor has no interest in the Ely Street property, the Debtor

could not have concealed such interest.

**Miscellaneous**

At trial and in its post-trial brief, the Plaintiff points to a number of other

transactions going back more than two decades.  Most of these transactions predate the

Plaintiff's 1995 default judgment against the Debtor.  Apparently, the Plaintiff hopes to

paint a picture of the Debtor as a person who has arranged his financial affairs in a manner

intended to stymie his creditors.  The evidence does not support this contention.  Indeed,

the Court is convinced that the Debtor paid or settled every major liability he has ever

incurred, other than the claim held by the Plaintiff, and that when he was unable to reach a

settlement with the Plaintiff he was forced to file this chapter 7 case.


II.      **CONCLUSIONS OF LAW**

Because the denial of a debtor's discharge "imposes an extreme penalty for

wrongdoing," section 727 "must be construed strictly against those who object to a debtor's

discharge and 'liberally in favor of the bankrupt.'" *State Bank of India v. Chalasani (In re

Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (quotation omitted).

The Plaintiff cites several decisions it argues are similar to the case at hand,

concerning debtors who transferred property interests to family members. *The Cadle Co. v.

Ogalin (In re Ogalin)*, 303 B.R. 552 (Bankr. D. Conn. 2004); *Gary J. Rotella & Assocs. (In re

Bellassai)*, 451 B.R. 594 (Bankr. S.D. Fla. 2011); *Coady v. D.A.N. Joint Venture, L.P.*, No.

08-81332, 2009 U.S. Dist. LEXIS 131019 (S.D. Fla. April 1, 2009), *aff'd,* 588 F.3d 1312 (11th Cir. 2009).  In each of the cases cited by the Plaintiff the evidence showed that the debtor had arranged his business affairs in a manner to conceal involvement in an entity from which the debtor received ongoing financial benefit.  Unlike in the cases cited by the Plaintiff, there is no credible evidence that the Debtor retained an interest in any property or entity transferred long ago or that the Debtor receives any income or financial benefit from any entity held by a family member other than the part-time use of a car that was fully disclosed.

In *In re Ogalin*, the debtor had operated a corporation and incurred substantial debts.  He formed a new corporation that performed the same services as the old one, had the same personnel, and operated from the same location, but was owned not by him but by certain members of his family.  The debtor at first served as an executive with the new corporation, but then "negotiated" a pay decrease on the condition that the entity pay all of the debtor's personal expenses.  The court found that this agreement to a limitless expense account was a way to conceal personal income from creditors. *In re Ogalin*, 303 B.R. at 562.

In *In re Bellassai*, the debtor's business suffered debts after a partner allegedly absconded with funds from the company bank account.  The debtor, recently divorced, entered into a personal relationship with a woman who "purchased" the business as a going concern.  She completed no due diligence and performed no oversight or sales duties aside from dropping off flyers at grocery stores and post offices.  The court found that the debtor's friend had little to do with the operation and success of the business, while the debtor received significant tangible benefits.  The court concluded that the debtor implemented this arrangement to divert the fruits of his labor to avoid payment of creditors. *In re Bellassai*, 451 B.R. at 602-03.

In *In re Coady*, a heavily-indebted businessman started a new company in his wife's

17

name.  As in the present case, the debtor had no checking account of his own.  However, the debtor in the *In re Coady* case signed his wife's name to a number of checks issued by the corporation that he used to pay his personal expenses.  In exchange for the debtor's labor, which was necessary to run the corporation, the debtor received substantial benefits including a golf club membership.  All of the activities in question occurred within five years of the debtor's bankruptcy filing.  The bankruptcy court found that the debtor had, with intent to shield assets from creditors, diverted the fruits of his labor to increase the value of his wife's business and then used business assets to support his personal lifestyle. *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1315 (11th Cir. 2009).

      In contrast to the striking facts of *In re Ogalin*, *In re Bellassai*, and *In re Coady*, the record here presents no credible evidence that the Debtor receives anything of material value from the entities pointed to by the Plaintiff.  Indeed, the reimbursements paid to the Debtor by Benco, a particular focus of the Plaintiff at trial, were so thoroughly documented that the Plaintiff conceded Count III of its Complaint.  Three other important factors differentiate this case from *In re Coady*, *In re Bellassai*, and *In re Ogalin*.  First, the Debtor consistently paid or settled all of his material debts until the filing of his chapter 7 petition, which was precipitated by the Debtor's inability to settle with the Plaintiff.  Second, the Debtor provided complete documentation of all transactions over a period extending back more than two decades.  The extent of the clear, detailed records maintained by the Debtor and the entities at issue is not typically found in cases where a debtor is attempting to hide assets or income from creditors.  Third, many of the transactions pointed to by the Plaintiff occurred before, in several instances long before, the Debtor had knowledge of his obligation to the Plaintiff.

      The Court will review the evidence presented in light of each count of the Complaint.

**Count I**

The Plaintiff objects to the Debtor's chapter 7 discharge pursuant to section 727(a)(2)(A), which provides, in pertinent part, that a debtor will not receive a discharge if he "with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." To sustain an objection under section 727(a)(2)(A), the Plaintiff must prove four components:  a) that the act complained of was done within the one year before the date of the filing of the petition; b) that the act was done with actual intent to hinder, delay or defraud a creditor; c) that the act was that of the debtor or a duly authorized agent of the debtor; and d) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done. *In re Jennings*, 533 F.3d at 1339.

Section 727(a)(2) is specifically limited to acts of the debtor within a year prior to the filing of a bankruptcy petition.  However, when considering an alleged concealment of assets the doctrine of "continuing concealment" allows the Court to look back more than one year if there is evidence that the Debtor has been hiding assets over a longer period that continues to within one year of the filing date. *In re Coady*, 588 F.3d at 1316.  Importantly, however, the concealment must be of "property of the debtor." 11 U.S.C. § 727(a)(2)(A).  The Plaintiff must prove that the Debtor concealed an interest in property and that the Debtor retained such interest in property during the year prior to the filing of his chapter 7 case. It is not sufficient to show that the Debtor transferred property in the past, even if such transfer was somehow improper, if the transfer did not leave the Debtor with a continuing interest in property. *Rosen v. Bezner*, 996 F.2d 1527, 1534 (3d Cir. 1993).

The Plaintiff argues that, in light of the number and complexity of the Debtor's transactions, the Court should look back five years prior to the filing of the Debtor's

19

bankruptcy petition on June 2, 2010.  The Plaintiff argues that if the Debtor was concealing

assets, the evidence of such concealment would be found in this period.  The Court need not

determine whether this five year period is an appropriate scope for the Court's examination

as the evidence presented by the Plaintiff, even going back beyond this period, does not

support the Plaintiff's claims under section 727(a)(2)(A).

     In support of its claims in Count I of the Complaint, the Plaintiff points to the Carol

Munch Trust, 42 South Gate, the non-existent "Benevento Family Trust," the Age 21

Trusts, the Broadway Shopping Plaza, 46 South Gate, Benco, Carmel, the proceeds from

the Amodio settlement and potential loans made with such proceeds[13], 8 Ely Street, the

Debtor's use of a car owned by Benco, and certain loan repayments made by Carmel to

Joan.  The Plaintiff argues that the Debtor retained or obtained interests in each of these

assets and entities that he has concealed and continued to conceal within the year prior to

his filing.  The Plaintiff contends that even now the Debtor receives tangible benefits from

these entities and properties.  As discussed in detail in the Court's findings of fact, above,

there is no credible evidence that the Debtor retains any interest in any of these assets or

entities, or that he receives any ongoing benefit other than the part-time use of a car and

the fact that his wife, Joan, uses certain loan repayments she receives from Carmel to make

payments on the Florida home owned by the Debtor and Joan.  A number of the

---

[13] The Complaint did not address the Debtor's settlement with Mr. Amodio or the use of the proceeds therefrom.  Fed. R. Civ. P. 15 is made applicable to these cases by Fed. R. Bankr. P. 7015. Rule 15(b)(2) provides: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue." The Debtor did not object to presentation of evidence with regard to the Amodio settlement or the use of proceeds therefrom as being outside the scope of the Complaint.  In its post-trial brief, the Plaintiff requested that the Complaint be deemed amended to conform to the evidence.  Thus, the Court considers the evidence presented in connection with the Amodio settlement and the disbursement of the proceeds therefrom to the extent presented by the Plaintiff.

transactions complained of by the Plaintiff have their inception prior to the Debtor even becoming obligated on the guaranty that give rise to the Plaintiff's claim. Many arose prior to the Debtor learning that the Plaintiff had a claim against him. The various transactions and entities are documented extensively. Indeed, the Debtor and his family members maintained detailed records of their transactions, right down to keeping copies of receipts presented by the Debtor for reimbursement. Many of the transactions are reflected in recorded documents. Some were even approved by a Connecticut state court. There is no credible evidence that the Debtor concealed anything that could create a claim under section 727(a)(2)(A). The Plaintiff did not meet its burden of proof on Count I of the Complaint.

**Count II**

The Plaintiff seeks to deny the Debtor's discharge under section 727(a)(3), which provides that the Debtor shall not be granted a discharge if "the Debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the Debtor's financial condition or business transactions might be ascertained . . . ." 11 U.S.C. § 727(a)(3). To sustain an objection to a discharge under section 727(a)(3), the Plaintiff must show either (a) a failure by the Debtor to keep or preserve any recorded information, including books, documents, records and papers, *or* (b) an act of destruction, mutilation, falsification or concealment of any recorded information including books, documents, records and papers by the debtor or someone acting for the debtor, *and* that the failure to keep such books or records or the act complained of renders it impossible to ascertain the financial condition and material business transactions of the Debtor. *See Menotte v. Moore (In re Moore)*, 375 B.R. 696, 702 (Bankr. S.D. Fla. 2007).

The Plaintiff argues that when the Debtor obtained a mortgage loan secured by 46 South Gate for the benefit of his children, the equitable owners of 46 South Gate, he

misrepresented to the mortgage lender that he was the owner of 46 South Gate, among other alleged misrepresentations to the mortgage lender, and that such falsification satisfies the requirements of section 727(a)(3).  The Plaintiff misconstrues the requirements of the statute.  To deny discharge under section 727(a)(3) based on falsification, the Debtor must have falsified financial records "from which the debtor's financial condition or business transactions might be ascertained . . . ." 11 U.S.C. § 727(a)(3); *see In re Moore*, 375 B.R. at 702.  In other words, the Plaintiff must show that the alleged falsification renders it impossible, or at least extremely difficult, to ascertain the financial condition and material business transactions of the Debtor. *Id.*  That the Debtor may have misrepresented certain facts to a mortgage lender years ago has no bearing on denial of discharge as it does not have any impact on the ability of the Court and parties in interest to ascertain this Debtor's financial condition or business transactions.  Indeed, the record paints a complete and detailed picture of the Debtor's financial condition and business transactions over a period exceeding two decades.

The Plaintiff also argues that the Debtor failed to maintain records illuminating the property interests the Debtor allegedly maintains in various entities and assets owned or controlled by his family members.  This is, in effect, a restatement of the Plaintiff's claims under Count I in the guise of section 727(a)(3).  As is apparent from the Court's findings of fact, above, there is no credible evidence that the Debtor has an interest in any of the assets or entities, or that he receives any income from the various entities, pointed to by the Plaintiff.  There is no need for the Debtor to maintain recorded information regarding assets and entities that he has no material interest in.  The Plaintiff did not meet its burden of proof on Count II of the Complaint.[14]

_____

[14] The Court notes that, even if the Debtor had an interest in any of the entities or assets pointed to

**Count III**

In its post-trial brief, the Plaintiff conceded Count III.

**Count IV**

The Plaintiff seeks denial of discharge under section 727(a)(5). In order to satisfy this provision, the Plaintiff must prove that the Debtor failed to explain satisfactorily a loss of assets or a deficiency of assets to meet his liabilities. 11 U.S.C. § 727(a)(5). The determination of whether a particular explanation is satisfactory is left to the discretion of the Court. *Fiala v. Lindemann (In re Lindemann),* 375 B.R. 450, 472-73 (Bankr. N.D. Ill. 2007) (outlining the proper analysis); *see also Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984). The Court may consider all relevant circumstances, including the materiality of any loss or deficiency in light of the facts of the case.

The Plaintiff implicitly argues that section 727(a)(5) includes a good faith requirement, that the Debtor's explanation of the loss or deficiency of assets must reflect good faith in how assets were used or dissipated, not just good faith in the maintenance of records and the presentation of the Debtor's explanation. But the focus of section 727(a)(5) is not on why the Debtor expended or dissipated assets. "'The Court need only decide whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper.'" *Stewart Tilghman Fox & Bianchi, P.A. v. Kane (In re Kane),* 470 B.R. 902, 934-35 (Bankr. S.D. Fla. 2012) (quoting *Great Am. Ins. Co. v. Nye (In re Nye)*, 64 B.R. 759, 762 (Bankr. E.D.N.C. 1986); *Bezner v. Robbins (In re Robbins),* 2008 WL 2038833, at *4 (Bankr. D.N.J. May 12, 2008) ("The definition of a reasonable

---

by the Plaintiff in Count II of the Complaint, the Debtor and his family members produced substantial financial and other records relating to these properties and entities, much of which was admitted at trial. The record reflects detailed information regarding any and all material transactions going back well beyond five years prior to the petition date. Thus, even if the Debtor had an interest in any of these properties or entities, the Plaintiff did not meet its burden under

explanation for § 727(a)(5) purposes is perhaps best elucidated by focusing on what it is not: it is not a justification for the use of the assets."); *Richardson v. Von Behren (In re Von Behren),* 314 B.R. 169, 181 (Bankr. C.D. Ill. 2004) ("While the Trustee is critical of the Von Behrens' 'lavish spending' on vacations and nice vehicles, the focus of § 727(a)(5) is not on whether such spending is on illegal, immoral, or otherwise imprudent activities, but rather on the sufficiency of the explanation for the loss."). "Other provisions in section 727(a) address the motivation for a debtor's actions. Section 727(a)(5) 'relieves creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor.'" *In re Kane*, 470 B.R. at 935 (quoting *First Commercial Fin. Grp. v. Hermanson (In re Hermanson),* 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002)); *see also Cohen v. Olbur (In re Olbur),* 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004).

In support of its claims in Count IV, the Plaintiff points to the proceeds of the Amodio settlement and 46 South Gate.  As noted above in the Court's findings of fact, the Debtor provided detailed and credible evidence of the disposition of the proceeds from his settlement with Mr. Amodio.  Likewise, the Debtor provided all relevant documents in connection with transactions affecting 46 South Gate, including copies of loan documents and his credible testimony regarding his personal involvement in those transactions.  The Court finds all of these explanations satisfactory.  The Plaintiff did not meet its burden on Count IV of the Complaint.

### Other Arguments

In addition to the four counts presented in the Complaint, the Plaintiff requests that the Court consider the Debtor's conduct in numerous transactions over more than two decades.  The Plaintiff suggests that the Debtor has been dishonest and that his actions

---

Count II.

were not consistent with his testimony.  It is not clear on what basis these general allegations would affect the Debtor's discharge.  The Court's power to deny discharge is defined exclusively by section 727, and the Court has addressed each of the specific allegations made by the Plaintiff under the relevant provisions of the statute.  In any case, as previously found, the Debtor was a thoroughly credible witness and his testimony was consistent with the documentary evidence admitted at trial.

III.    **CONCLUSION**

For the foregoing reasons, the Court will enter a separate judgment in favor of the Debtor, denying all relief requested in the Complaint.

###

Copies furnished to:

All counsel of record.